Sarah E. Marinho, SBN 293690
**MARINHO LAW FIRM**
111 N.  Market St., Ste 300
San Jose, CA 95113
T: (408) 827-8690
E: sarah@marinholawfirm.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

P.C and M.C., minors by and through their Court-appointed Guardian ad litem, Mary Anna Machi,

    Plaintiffs,

v.

COUNTY OF SONOMA; ESTATE OF JACQUELINE JOHNSON; MONISHA SASHITAL; ESTATE OF BOB HARPER; LINDA MORRISSEY; LESLIE WINTERS; JANET TAYLOR, SOCIAL WORKER DE LA CRUZ; ANDREA KROEZE; DEBORAH GILDAY; D. ROMERO; JOSEPHINE MCCAY; FREDERICK JONES; AMY LAFFERTY; CITY OF ROHNERT PARK; OFFICER GONZALES; OFFICER GROAT; TLC CHILD & FAMILY SERVICES; JOSE A. CENTENO; ESTATE OF GINA M. CENTENO; and DOES 1-20, inclusive,

    Defendants.

Case No.

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND MONELL RELATED CLAIMS**

<u>DEMAND FOR JURY TRIAL</u>

Minor Plaintiffs P.C. and M.C., by and through their Guardian ad litem, Mary Anna Machi, allege as follows:

1. Plaintiffs assert that the statutory or other basis for the exercise of jurisdiction in this United States Federal District Court is based upon a federal question asserted under 42 U.S.C. §1983 as to violations of Plaintiffs' rights under the U. S. Constitution and laws, including those under the First, Fourth and Fourteenth Amendments.

2. At all relevant times mentioned in this Complaint, Minor Plaintiff P.C. (born 2009) lived within Sonoma County, California. Mary Anna Machi was appointed by the Superior Court of the State of California for the County of Sonoma as the Guardian ad Litem for Minor Plaintiff P.C. for all purposes concerning his civil rights and other legal claims.

3. At all relevant times mentioned in this Complaint, Minor Plaintiff M.C. (born 2010) lived within Sonoma County, California. Mary Anna Machi was appointed by the Superior Court of the State of California for the County of Sonoma as the Guardian ad Litem for Minor Plaintiff M.C. for all purposes concerning her civil rights and other legal claims.

4. At all times mentioned herein, the COUNTY OF SONOMA ("COUNTY") was and is a public entity organized and existing under the laws of the State of California. At all times relevant hereto, the COUNTY was working through its subdivisions, including its Family, Youth and Children's Services ("FYCS") division.

5. At all times mentioned herein, JACQUELINE JOHNSON ("JOHNSON") was an employee of the COUNTY's FYCS division. JOHNSON's death preceded the filing of this complaint, so her estate is named instead of her individually.

6. At all times mentioned herein, MONISHA SASHITAL ("SASHITAL") was an employee of the COUNTY'S FYCS division.

7. At all times mentioned herein, BOB HARPER ("HARPER") was an employee of the COUNTY's FYCS division. HARPER'S death preceded the filing of this complaint, so his estate is named instead of him individually.

8. At all times mentioned herein, LINDA MORRISSEY ("MORRISSEY") was an employee of the COUNTY's FYCS division.

9. At all times mentioned herein, LESLIE WINTERS ("WINTERS") was an employee of the COUNTY's FYCS division.

10. At all times mentioned herein, JANET TAYLOR ("TAYLOR") was an employee of the COUNTY's FYCS division.

11. At all times mentioned herein, COUNTY social worker DE LA CRUZ ("DE LA CRUZ") was an employee of the COUNTY's FYCS division.

12. At all times mentioned herein, ANDREA KROEZE ("KROEZE") was an employee of the COUNTY's FYCS division.

13. At all times mentioned herein, DEBORAH GILDAY ("GILDAY") was an employee of the COUNTY's FYCS division.

14. At all times mentioned herein, D. ROMERO ("ROMERO") was an employee of the COUNTY's FYCS division.

15. At all times mentioned herein, JOSEPHINE MCCAY was an employee of the COUNTY's FYCS division.

16. At all times mentioned herein, FREDERICK JONES ("JONES") was an employee of the COUNTY'S FYCS division.

17. At all times mentioned herein, AMY LAFFERTY ("LAFFERTY") was an employee of the State of California Adoption Services Bureau.

18. At all times mentioned herein, the CITY OF ROHNERT PARK ("CITY") was and is a public entity. At all times relevant hereto, the CITY was working through its subdivisions, including its Department of Public Safety ("RPDPS").

19. At all times mentioned herein, OFFICER GONZALES ("GONZALES")

3

was an employee of RPDPS.

20.    At all times mentioned herein, OFFICER GROAT ("GROAT") was an employee of RPDPS.

21.    At all times mentioned herein, TLC CHILD & FAMILY SERVICES ("TLC") was and is a corporation organized and existing under the laws of the State of California.

22.    At all times mentioned herein, Defendants GINA M. CENTENO and JOSE A. CENTENO (collectively, "the CENTENOs") were individuals living within the County of Sonoma, State of California. GINA CENTENO'S death preceded the filing of this complaint and therefore her estate is sued instead of her individually.

23.    Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as Does 1 through 20, Inclusive, and therefore sue them by such fictitious names. Plaintiffs will amend this Complaint to show the true names and capacities of said DOE Defendants when the same are ascertained.

24.    Plaintiffs are informed and believe, and based upon such information and belief allege, that each of the Defendants is responsible in some manner for the events and happenings referred to herein and was the legal cause of injury and damages to Plaintiffs as herein alleged.

25.    Plaintiffs are informed and believe, and based upon such information and belief allege, that at all times herein mentioned each and every Defendant was the agent and/or employee of their co-Defendants, and each of them, acting at all relevant times herein under color of the authority of a governmental entity under the statutes, ordinances, regulations, customs and usage of the State of California and/or the United States Constitution and related laws, and with the power and authority vested in them, or ratification, endorsement, or approval of the conduct with respect to the events and happenings alleged herein.

**COMMON ALLEGATIONS**

26.    Plaintiffs were removed from the care of their parents, and their custody

4

was transferred to Defendants, for the explicit purpose of keeping them safe from further harm and ensuring their well-being. But the County's child welfare system failed in its legal obligations, duties, and responsibilities to Plaintiffs as foster children. The County's conduct, and that of the City of Rohnert Park and TLC Defendants herein, reflects deliberate indifference to the health and safety of Plaintiffs, that the Defendants are obligated to protect, as well as violating their Constitutional rights under both federal and state law. As a result, Plaintiffs have sustained numerous injuries detailed below including physical abuse and emotional abuse.

27.     In October 2006, the County placed three siblings (Kaya, Michelle, and P.K.) in the home of Defendants Jose and Gina Centeno. Defendant County had an obligation to investigate the conditions of the home and provide services to the children it had placed in the care of Defendants Jose and Gina Centeno. Defendant County further had an obligation to investigate the level of care Defendants Jose and Gina Centeno were providing to the children in their care. Plaintiffs are informed and believe, and based thereon allege, that Defendant County and TLC failed to conduct full background checks on Defendants Jose and Gina Centeno's home, failed to properly inspect Defendant Jose and Gina Centeno's home, and failed to speak with Kaya, Michelle and P.K. about the care they were receiving outside the presence of Defendants Jose and Gina Centeno.

28.     On September 24, 2008, Defendants Jose and Gina Centeno adopted Kaya, Michelle and P.K. Upon the adoption, the County withdrew all services that had been provided to the children.

29.     On or about June 23, 2009, Defendant COUNTY placed another foster child (Plaintiff P.C.) with the Centenos. Plaintiffs are informed and believe that prior to P.C.'s placement, the COUNTY did nothing to evaluate the safety of the children already living in the Centeno household, including Kaya, Michelle and P.K., as required by law. Defendants were aware that Kaya, Michelle and P.K. had emotional

and psychological issues and that the Centeno's were having trouble caring for them. Plaintiffs are informed and believe that through agreements with the County and/or the State, Defendant TLC conducted an investigation into whether the Centeno household was an appropriate environment for foster children. TLC's investigation was not thorough, staff did not speak with Jose Centeno or determine whether the Centeno's had a source of income other than revenues paid to them by the County and/or State for fostering children, did not speak to the Centeno's biological children about the conditions in the home, and did not conduct a full investigation of the Centeno home. TLC knew and understood that the County and State relied upon TLC's professional services, in part, to make placement decisions such as the placement of P.C. and M.C.

30.    Within only a few weeks of P.C.'s placement with the Centenos, there was evidence that the CENTENOs were incapable of caring for the children in their care and custody. In September 2009, the CENTENOs had begun to "home school" Michelle due to her behavior. In addition, although the CENTENOs had been informed that all of the children in their care needed therapy, they had not sought therapy for the children. As of September 2009, Gina Centeno was reporting that Michelle was pulling her hair out, couldn't sit still, was bossy and aggressive, and would not follow rules.

31.    Despite the issues the CENTENOs were having with the children already in their care, on March 1, 2010, the COUNTY placed an infant (Plaintiff M.C, Plaintiff P.C.'s sister) with Defendants Jose and Gina Centeno. Plaintiffs are informed and believe that prior to M.C.'s placement, the COUNTY did nothing to evaluate the safety of the children already living in the Centeno household, including Kaya, Michelle, and P.K., as required by law. With M.C., Jose and Gina Centeno now had 8 children living in their household – their three biological children, who were teenagers, Kaya, Michelle, and P.K. (8, 7, and 6 years old), a toddler (P.C.) and an infant (M.C.).

32.    Within only a few months of the COUNTY's placement of an 8th child in the Centeno household, on September 7, 2010, there was a report to the COUNTY that Defendant Jose Centeno was physically abusing the children. The reporting teacher, who was affiliated with the school attended by Kaya, Michelle, and P.K. reported that all three children were coming to school with unexplained bruises. The reporting party advised that Defendant Gina Centeno had a history of telling her that the children (all of whom were under 8) were "difficult, are manipulative, and they lie."  She reported that when she told P.K. that she was going to call his mother to tell her that he had been wandering around the school grounds, he began to sob uncontrollably and scream. He told her that he would be in trouble and would be spanked 20 times. He said he got spanked every day. He said that he, Kaya and Michelle were spanked with belts and "wooden spoons that never break." He said that his parents (the CENTENOS) hit Kaya, and scared him. The reporting party further reported that Gina Centeno was cold toward the children, that she told the reporting party that she didn't know how to handle the children, and that pretty soon the school wouldn't be able to "handle this shit."

33.    The COUNTY worker who took the emergency response call referred it to Defendant SASHITAL, who was the COUNTY's social worker responsible for the safety of P.C. and M.C., who had recently been placed with the CENTENOs as foster children. No other action was taken on this referral.

34.    On September 13, 2010, the reporting party called to report that P.K. and Kaya told her that they are afraid of their parents, are called "bad," "liars," and "asshole," and are told that they are going to "get their asses kicked." She reported that on a daily basis, P.K. was visibly upset about being picked up. She reported that on a recent visit to the school, Gina Centeno told P.K. that she was "fed up with him and that his dad would deal with him." P.K. reported that his dad spanked him with a "Raiders" belt on his bare bottom. P.K. said he wished he didn't have parents. P.K. also told the reporting party that he was afraid his mother was there, and that she was

"always watching." The day after these events took place, P.K. was absent from school.

35.    The referral was assigned to Defendant JOHNSON. Her first contacts were on September 14, 2010. On that date, she learned that P.K. had come to school with a red mark around his neck which appeared that he had been pulled by his shirt. The teachers reported they were deeply concerned about the children. In fact, the school staff had made *4 reports to the COUNTY in the span of a single week.* Defendant JOHNSON learned that Michelle K., also, had reported being spanked with a big black belt.

36.    Over the next few days, Defendant JOHNSON interviewed Kaya, Michelle K. and P.K. Michelle K. reported to her that her parents use their fists and hands to hit her, that her mom hit her with a hair brush, and that her mom hit her in the face and knocked her tooth out. Michelle K. reported that she was afraid of her parents. She stated that for time outs, her parents make her stand in a corner and put her hands up, stay in her bed "for weeks," or stand in the shower holding something heavy. P.K. reported that "mom really hates me," and calls him an "asshole" and a "liar." He reported his mother spanks him with a belt or spoon and that his father pinches and twists his ear. He told Defendant JOHNSON that he was afraid of both of his parents, but was more afraid of his father. Defendant JOHNSON described P.K. as a "child who has been victimized and is seeing the world as a victim." Kaya told Defendant JOHNSON that she was "really scared of my dad." She said he did mean things to her and hurts her feelings. He said that he pinches and twists her ears, and that both parents make her stay outside by herself all alone for a long time and hit her. She told Defendant JOHNSON that she did not feel safe at home. She reported that Jose Centeno would push her off a wooden stool, kick her, and call her names like "asshole" and "bonehead."

37.    On September 17, 2010, Defendant JOHNSON met with Gina and Jose Centeno, who were present along with Plaintiffs P.C. and M.C. During this encounter,

the Centenos placed all of the blame on Kaya, Michelle K. and P.K. They said that Kaya had sexualized behaviors, and that all three older children were liars. The parents did admit to taping gloves on Kaya's hands at night to keep her from masturbating, to making the children have time outs in the shower, and to putting alarms on their beds.

38.    The notes from this encounter show that Defendant JOHNSON, like the teachers at the children's school, was deeply concerned about the welfare of the children living in the Centeno household. Following these meetings, Defendant JOHNSON discussed her concerns about the children and the parents with Defendant SASHITAL.

39.    On September 21, 2010, Defendants JOHNSON, SASHITAL and HARPER discussed the referral. During this meeting, Defendant JOHNSON advised that she felt the family was overwhelmed due to the children's behavior problems and the number of children in their household. She advised she believed some of the allegations were valid as the children's statements were consistent. Defendant JOHNSON informed Defendants SASHITAL and HARPER that she believed the system had taken advantage of the parents as it was inconceivable to her to think that 2 parents (only one of whom is home most of the day) could be successful in meeting the needs of these 3 traumatized children as well as 2 very young children who require significant time and attention and will have their own issues emerging soon. She advised that the family was in need of strong support and the children were in "dire need of intensive therapy immediately." She stated that the parents were in denial of their ability to cope with the behaviors appropriately, and that she believed them to be overwhelmed.

40.    The information learned by Defendant JOHNSON during her investigation was also provided to the STATE and its representative LAFFERTY, who was the Adoption Services representative in charge of the adoption of P.C. and M.C. and to TLC, who was the agency working with the COUNTY and the STATE

on the adoption of P.C. and M.C.

41.  Following her investigation, Defendant JOHNSON filed her Investigation Narrative, substantiating the allegation of emotional abuse against the Centenos, and finding the allegation of physical abuse inconclusive. In doing so, she stated that the interviews indicated a pattern of harsh physical punishment and verbal abuse, with all three children fearing their parents and describing similar punishments from their parents. In this report, Defendant JOHNSON stated that she believed the CENTENOs were overwhelmed and **should not care** for P.C. and M.C. This information was provided to the STATE and its representative, Defendant LAFFERTY, and to TLC.

42.  On September 24, 2010, Defendant JOHNSON met again with Defendant Gina Centeno. *Jose Centeno was not interviewed.* After the meeting, Defendant JOHNSON again expressed her belief that the parents were overwhelmed, and had asked them to look at their limitations honestly; advising it would be a "better and less damaging decision to give up the younger children at this time." Defendant JOHNSON advised that she was concerned about the parents' frustration level, volatility and possibility of burn out, and told them that she "truly feel their trouble with the children's behaviors are going to be more difficult as they grow older."

*43.*  On September 30, 2010, Defendant JOHNSON consulted with Defendants MORRISSEY, WINTERS, and SASHITAL. Once again, Defendant JOHNSON expressed her considerable concerns for this family and the parents' ability to adequately and appropriately parent the children in their care. *She identified Kaya, Michelle and P.K. at "high risk" children,* and that the risk would be increased with the adoption of the two younger children. This information was provided to the STATE and its representative, Defendant LAFFERTY, and to TLC.

44.  A few days after this meeting, Defendants JOHNSON and LAFFERTY learned that Gina Centeno had taken her children out of school and had also pulled them out of after-school programs.  There was now no one to observe or report on the

welfare of the children in the care of the Defendant the CENTENOs.

45.     Despite Defendant JOHNSON's purported "considerable concerns," and her consultations with Defendants SASHITAL, HARPER, WINTERS and MORRISSEY, her report that the children were at "high risk," and that allowing the CENTENOs to adopt the other two children would increase that risk, no services of any kind were provided to Kaya, Michelle or P.K. by the COUNTY, the STATE, or TLC. There is no indication that anybody from the COUNTY, the STATE, or TLC did anything further to check on the welfare of these "high risk" children, who were now at an increased risk as a result of the actions of the COUNTY, STATE, and TLC, and their employees.

46.     Instead, the COUNTY, the STATE, and TLC went full-steam ahead with the plans for Defendants the CENTENOs to adopt P.C. and M.C. This adoption was finalized on August 19, 2011.

47.     Between the adoption of M.C. and P.C. in August 2011 and late 2018, it is clear that Defendant JOHNSON's concerns became realities. During that time period, Jose and Gina Centeno shackled Kaya, Michelle K., and P.K, to their beds in their rooms or kept them in cages. Kaya hasn't been seen since approximately 2012. Gina and Jose Centeno won't say what happened to Kaya, and she is feared to be dead. Plaintiffs Michelle K. and P.K. were abused emotionally, physically, and sexually by the CENTENOs, severely neglected by the CENTENOs, and tortured by the CENTENOs. Alarms were placed on their beds to prevent them from leaving. Plaintiffs Michelle K. and P.K. were treated worse than animals.

48.     During that same time period, Defendant JOHNSON's fears regarding M.C. and P.C. also began to manifest themselves. On October 31, 2018, a Suspected Child Abuse Report ("SCAR") was submitted to the COUNTY, and specifically to Defendant DE LA CRUZ, by M.C. and P.C.'s school with concerns about their behavior. Defendant DE LA CRUZ took no action of any kind on this SCAR until January 3, 2019, when she finally forwarded it to Defendant KRUEZE. In the SCAR,

it was reported that P.C. was creating an unsafe environment at home and was endangering himself and others. He deliberately rode his bike in front of traffic, and was destroying things within his home. The reporting party advised that both M.C. and P.C. were in emotionally disturbed special education classes, and that "Mom Gina needs support at home." P.C. reported to the reporting party that his father was emotionally and mentally abusive.

49. The Emergency Response Referral concerning the October 31, 2018 SCAR listed the history of emotional and physical abuse toward Kaya, Michelle K. and P.K. The only investigation performed on this SCAR and Emergency Response Referral was to speak with the reporting party. Defendant KRUEZE did not speak with P.C., M.C., Gina or Jose Centeno, or evaluate their home and living conditions. Defendant KRUEZE instead marked it as "evaluate out. Insufficient information to show that either parent has failed to protect either minor or failed to seek proper mental health support services for them. Insufficient information that the father's actions have caused and/or will lead to further emotional trauma to the minors." Although Kaya, Michelle K. and P.K. were listed as additional children living in the home, there is no reference to any questions or investigation taken by the COUNTY, or any reference to Defendants DE LA CRUZ and/or KRUEZE reviewing this past history (and specifically Defendant JOHNSON's extensive notes about the children in the Centeno home being at "high risk" of abuse and neglect.) This SCAR was simply closed.

50. On February 7, 2019, yet another Emergency Response Referral was received by the COUNTY regarding concerning behaviors by P.C. and M.C., including a "marked increase in [M.C.'s] physical outbursts at school 'possibly related to the conflict in the home.' " The Referral stated "the mother is trying very hard to address this dynamic and has expressed that she does not know what to do. The mother presents as very overwhelmed." This Referral was assigned to Defendant TAYLOR. The Referral listed Kaya, Michelle K. and P.K. as other children living in

the home and referred to the 2010 investigation regarding emotional and physical abuse of those children. However, there is no evidence that Defendant TAYLOR had reviewed any documents pertaining to the 2010 referral, including, but not limited to Defendant JOHNSON's extensive notes about the children being at "high risk" with this family.

51.    Although Defendant TAYLOR's notes refer to the home having 5 bedrooms, she did not actually tour the home, but just recorded Gina Centeno's answer to her question about the number of bedrooms.

52.    During TAYLOR's interview, Gina Centeno mentioned that the family received subsidy payments from their adoption of the children. Although the Referral mentioned five adopted children, Defendant TAYLOR did nothing to ask questions about the other three. *Shockingly, Defendant TAYLOR wrote in her note "Neither parent has a history of child abuse."* Defendant TAYLOR concluded her investigation by stating "no safety concerns identified." She closed the investigation as "unfounded."

53.    In completing the SDM Risk Management tool connected with this Referral, Defendant TAYLOR concluded "no safety threats were identified at this time. Based on currently available information, there are no children likely to be in immediate danger of serious harm."

54.    At or about this time, Defendants Jose and Gina Centeno made the decision to rid themselves of Plaintiffs Michelle K. and P.K, in fear that Defendant COUNTY social workers would return. The CENTENOs traveled to Guanajuato, Mexico with Plaintiffs Michelle K. and P.K. and left them with a distant relative of Jose Centeno. The CENTENOs then came back to Sonoma County. Although the CENTENOs only had two children left to care for (as their biological children were now adults), reports of abuse of those children continued to be received by the COUNTY.

55.    In or about late March or early April 2019, the COUNTY, and

specifically Defendants KROEZE and ROMERO, received a report of multiple bruises on M.C.'s arm which Gina Centeno claimed were inflicted at M.C.'s school. Although this report generated an Emergency Response Referral which included the names of all of the children who were supposed to be in the care of Gina and Jose Centeno, Defendants KROEZE and ROMERO made the determination to designate the report as "evaluated out," stating "no reported concerns for [M.C.] in the home." No person from the COUNTY, including, but not limited to Defendants KROEZE and ROMERO, questioned M.C. or Gina Centeno, or inquired about the other children in the home.

56.    On July 23, 2019, another referral was received by the COUNTY, through Defendant GILDAY. Although this report generated an Emergency Response Referral which included the names of all of the children who were supposed to be in the care of Gina and Jose Centeno, and the prior substantiated findings of emotional abuse and inconclusive findings of physical abuse of Plaintiffs Michelle K. and P.K., it was "evaluated out" by Defendant GILDAY.

57.    On October 22, 2019, M.C. threatened to jump off the roof the Centeno residence or hang herself. This was reported to the Rohnert Park Police Department, with Officer Gonzales responding. Officer Gonzales placed Maci on a 5150 hold.

58.    On January 1, 2020, the COUNTY received a report that M.C. had disclosed her father hit her. Although this report generated an Emergency Response Referral which included the names of all of the children who were supposed to be in the care of Gina and Jose Centeno, and the prior substantiated findings of emotional abuse and inconclusive findings of physical abuse of Plaintiffs Michelle K. and P.K., it was "evaluated out" by the COUNTY.

59.    On February 13, 2020 and February 26, 2020, Rohnert Park Police Department officers responded to the Centeno house three times. On the first occasion, they arrived due to a report that P.C. was throwing items around the house. On the second occasion, M.C. was again placed on a 5150 hold.

60.    On June 30, 2020, an American citizen noticed Michelle K. and P.K. in a store in Mexico. She was told by the woman accompanying the children that they had been left with her. She was told by the woman that Michelle K. had disclosed to her that they had been "kidnapped for 8 years" before being brought to Mexico, and that her father had raped her while he was holding her hostage in a room. Further questioning revealed that Michelle K. and P.K. had been sexually and physically abused for years before and after they were taken to Mexico. The American citizen contacted the authorities, and on or about July 4, 2020, Plaintiffs Michelle K. and P.K were taken by Mexican social services.

61.    The children were interviewed and examined while in the custody of Mexican social services. Michelle K. informed them that Jose Centeno "blamed" them for "everything," and began to beat them. He locked them in a room and chained them to the bed. She revealed that Jose Centeno had sexually abused her since she was about 9 years old. Both children revealed that they hadn't been to school since they were 6-7 years old (i.e. 2010). A sexual abuse examination performed on Michelle K. revealed findings consistent with her narrative.

62.    The COUNTY was notified of the claims of abuse, neglect and abandonment of the children on or about July 23, 2020. The notes from the initial ER referral state "Review of CPS history collaborates some of the story, such as being in a room with a sensor to alarm parents when they leave and the physical abuse." The CPS history was of events which took place in the Centeno household <u>before</u> the adoption of P.C. and M.C.

63.    Had the COUNTY and its social workers complied with their statutory duties, they would have learned, <u>before</u> the Centenos were allowed to adopt P.C. and M.C., that  Michelle and P.K. had not seen Kaya (their sister) for many years; that Defendants Jose and Gina Centeno inflicted abuse, molestation, torture, and enslavement upon Michelle K. and P.K.; that Defendants Jose and Gina Centeno would routinely restrict food to Michelle K. and P.K.; and that Michelle K. and P.K.

were not receiving routine medical and dental care. They also would have learned that Defendants Jose and Gina Centeno were shackling Michelle K. and P.K. in an upstairs room for hours and days at a time, with no access to a bathroom; that P.K. was made to sleep on a mat inside of a cage; that Michelle K. had a security alarm placed on her bed that prevented her from the leaving the bed and the room; that the children were made to run barefoot on a wooden patio for punishment; that Michelle K. was dragged by her hair by Defendants Jose and Gina Centeno; that the children were told they could not talk to each other; that the children were locked into a dog cage for punishment; that Defendants Jose and Gina Centeno would punch, hit and otherwise physically abuse the children; that Defendants Jose and Gina Centeno would hit the children with a wooden spoon while they were forced to bend over.

64.    Prior to the time Defendant COUNTY placed P.C. and M.C. with Defendants Jose and Gina Centeno, P.K. had reported to Defendant COUNTY, through its social worker, Defendant JOHNSON, that he was being abused by Defendants Jose and Gina Centeno, including that they forced him to run barefoot on a wooden patio, that they spanked him with a wooden spoon and a belt with a Raiders belt buckle, and that they denied him a bed to sleep in. Despite these reports, and Defendant JOHNSON's significant concern about the risk to M.C. and P.C., Defendants COUNTY, SASHITAL, and other defendants whose identities are presently unknown moved forward with the adoption process and ultimately approved the adoption, thus increasing the risk of harm that ultimately occurred to these children. During this process, Plaintiffs were not provided with any services, and no further investigations were done concerning their welfare, health, or safety.

65.    In addition, prior to the time the COUNTY placed P.C. and M.C. with Defendants Jose and Gina Centeno, Michelle K. had reported to Defendant COUNTY, through its social worker, Defendant JOHNSON, that she was being abused by Defendants Jose and Gina Centeno, including that they spanked and hit her. Michelle K. had bruises on her body that would have been visible to COUNTY

social workers, including Defendant JOHNSON, had they conducted any type of reasonable inspection or interview with Michelle K. Despite these reports, and Defendant JOHNSON's significant concern about the risk to and safety to M.C. and P.C., Defendants COUNTY, SASHITAL, and other defendants whose identities are presently unknown moved forward with the adoption process and ultimately approved the adoption. During this process, Plaintiffs were not provided with any services, and no further investigations were done concerning their welfare, health, or safety.

66.    Prior to the time the COUNTY, including its social worker Defendant SASHITAL, approved Defendants Jose and Gina Centeno's adoption of M.C. and P.C., Michelle K., Kaya and P.K. were sharing a single bedroom in the Centeno home, with one bunk bed for the three children and alarms affixed to it to alert Defendants Jose and Gina Centeno if the children got out of their beds. Had the COUNTY conducted any reasonable inspection of the Centeno home, they would have seen and observed there were insufficient beds for the children who had been placed with the CENTENOs.

67.    Prior to the time the COUNTY placed M.C. and P.C. with Defendants Jose and Gina Centeno, and after the school had reported their abuse to the COUNTY, the CENTENOs pulled Kaya, Michelle K., and P.K. out of public school to "homeschool" them. During the process to approve the CENTENOs and their home to adopt P.C. and M.C., Defendant COUNTY conducted no investigation as to the "homeschooling" purportedly being provided to the children by the CENTENOs. Plaintiffs are informed and believe, and based thereon allege, that any reasonable investigation would have revealed that the CENTENOs were not providing any meaningful education to the children placed by the COUNTY in their home, and that they were abusing and neglecting the children.

68.    On or before the time that the COUNTY placed P.C. and M.C. with Jose and Gina Centeno, Defendant Jose Centeno committed rape by force, sodomy by force, lewd and lascivious acts on a child, and sexual penetration against the will of

another (as charged in criminal proceedings filed in August 2020). Jose Centeno sexually abused all children who had been placed by the COUNTY in the Centeno household. Plaintiffs are informed and believe, and based thereon allege, that Defendant Gina Centeno knew, or should have known, of Defendant Jose Centeno's sexual abuse of the children, but did nothing to intervene. Had the COUNTY conducted any reasonable inspection, interviews, or investigation of the Centeno home and the children living in that home before allowing M.C. and P.C. to be adopted, the COUNTY would have learned of the sexual abuse of the other children.

69.     Defendants Jose and Gina Centeno were arrested Aug. 19, 2020, and booked into the Sonoma County Jail on $18 million bail. They have been charged with felony torture and other crimes, according to the 14-count complaint filed Aug. 20, 2020, in Sonoma County Superior Court. Defendant Jose Centeno was also charged with an additional nine felony crimes for his suspected sexual abuse of Kaya. Defendants Jose and Gina Centeno face life sentences if convicted. Defendants Jose and Gina Centeno are in custody and charged with multiple felonies. Due to their danger to the public and specifically to Plaintiffs, the Court has not allowed bail.

70.     Defendant Jose Centeno has been charged with the following crimes: 3 counts of California Penal Code section 209, subdivision (a) (kidnapping for ransom) and 2 counts of California Penal Code section 206 (torture) occurring on or about October 1, 2010; 2 counts of California Penal Code section 261, subd. (a)(2) (rape by force) with two special allegations for sex crimes for each count, 1 count of California Penal Code section 286, subd. (c)(2)(A) (sodomy by use of force) with two special allegations for sex crimes, 1 count of California Penal Code section 288, subd. (b)(1) (lewd & lascivious act with a child) with a special allegation for sex crimes, 2 counts of Penal Code section 289, subd. (a)(1)(A) (sexual penetration against the will of another), and 1 count of California Penal Code section 220, subd. (a)(2) (assault with the intent to commit a felony) occurring on about January 1, 2012; 1 count of California Penal Code section 220, subd. (a)(2) (assault with the intent to commit a

felony.

71.     Defendant Gina Centeno has been charged with the following crimes: 3 counts of California Penal Code section 209, subdivision (a) (kidnapping for ransom) and 2 counts of California Penal Code section 206 (torture) occurring on or about October 1, 2010.

72.     Defendants' actions have caused Plaintiffs to suffer from significant emotional and mental distress. Plaintiffs have suffered and will continue to suffer from PTSD, anxiety, fear, mental and emotional distress, loss of enjoyment of life, humiliation, and other trauma-based physical, mental and emotional signs and symptoms.

73.     On November 10, 2021, Plaintiff presented the COUNTY with their Government Code §910 claim. The claim was rejected by operation of law.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983, 1985**

**(Fourteenth Amendment Substantive Due Process (*Tamas* Claim), By Plaintiffs Against All Defendants)**

74.     Plaintiffs adopt and incorporate as if set forth at length, and to the extent applicable, the paragraphs set forth hereinabove.

75.     At all applicable times herein, Defendants were acting under color of state law.

76.     Said Defendants, and each of them, deprived Plaintiffs of their clearly established and well-settled rights under the Fourteenth Amendment to the United States Constitution, including their right to be free from harm while involuntarily in government custody and their right to medical care, treatment, and services. Defendants' conduct includes the following acts and omissions: (a) failure to adequately provide medical, dental and mental health services, including but not limited to standardized periodic health screenings and treatments; (b) failure to conduct legally required visits with foster children; (c) failure to adequately respond

to reports of abuse; (d) failure to ensure adequacy of relative caregiver placements.

77.     Plaintiffs are informed and believe that said Defendants, and each of them, acted, knew and/or agreed, and/or thereby conspired together until on or about July 23, 2020, to deprive and continue to deprive Plaintiffs of their constitutional rights without proper reason or authority, court order, probable cause, and with deliberate indifference to said Plaintiffs' rights and/or by failing to correct the wrongful conduct of other Defendants.

78.     As a direct result of the conduct by said Defendants, and in accordance with 42 U.S.C. §1983 and §1985, Plaintiffs' civil rights have been violated in that they have suffered, and will continue to suffer, damages, including but not limited to, significant physical and emotional harm, mental anxiety and anguish; as well as to incur attorneys' fees, costs and expenses in this matter as authorized by 42 U.S.C. §1988, in an amount not yet ascertained, all of which shall be shown according to proof at trial.

79.     Said Defendants wrongful and unlawful conduct as herein alleged was intentional, done with malice, and/or performed with conscious disregard for Plaintiffs' rights. As a result of their despicable conduct, Plaintiffs are entitled to recover punitive damages from Defendants for their wrongful acts in in an amount to be shown according to proof at trial.

### SECOND CLAIM FOR RELIEF

### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983, 1985

### (Fourteenth Amendment Substantive Due Process (State Created Danger Violation of Liberty Interest) – By All Plaintiffs Against all Defendants)

80.     Plaintiffs adopt and incorporate as if set forth at length, and to the extent applicable, the paragraphs set forth hereinabove.

81.     At all applicable times herein, Defendants were acting under color of state law.

82.     Said Defendants, and each of them, knew and agreed, and thereby

conspired, to interfere with and continue to interfere with, all Plaintiffs' clearly established and well-settled rights to personal liberty under the Fourteenth Amendment to the United States Constitution. Said Defendants' conduct includes acting with deliberate indifference to known or obvious danger in placing Plaintiffs in the care of foster parents who were unfit to care for them and posed an imminent risk of harm to Plaintiffs' safety.

83.    Plaintiffs are informed and believe that said Defendants, and each of them, acted, knew and/or agreed, and/or thereby conspired together until at least July 23, 2020, to continue to deprive Plaintiffs of their constitutional rights without proper reason or authority, court order, probable cause, and with deliberate indifference to Plaintiffs' rights and/or by failing to correct the wrongful conduct of other Defendants.

84.    As a direct result of the conduct by Defendants, and in accordance with 42 U.S.C. §1983 and §1985, Plaintiffs' civil rights have been violated in that they have suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish; as well as to incur attorneys' fees, costs and expenses in this matter as authorized by 42 U.S.C. §1988, in an amount not yet ascertained, all of which shall be shown according to proof at trial.

85.    Said Defendants' wrongful and unlawful conduct as herein alleged was intentional, done with malice, and/or performed with conscious disregard for Plaintiffs' rights. As a result of their despicable conduct, Plaintiffs are entitled to recover punitive damages from Defendants for their wrongful acts in in an amount to be shown according to proof at trial.

**THIRD CLAIM FOR RELIEF**

***MONELL*-RELATED CLAIMS**

**(By Plaintiffs against the COUNTY and TLC)**

86.    Plaintiffs adopt and incorporate as if set forth at length, and to the extent applicable, the paragraphs set forth hereinabove.

87.    At all relevant times herein, Defendant COUNTY, including through its FYCS, and Defendant TLC, as an agent of Defendant COUNTY, established, implemented, promulgated and/or followed written policies and procedures and/or longstanding and widespread customs and/or practices (hereinafter collectively referred to as "policy" or "policies") which policies were the cause of violation of Plaintiffs' constitutional rights granted to them pursuant to 42 U.S.C. § 1983, as well as the case of *Monell v. New York City Department of Social Services* (1978) 436 U.S. 658, including those under the Fourteenth Amendment. These written policies and procedures, and longstanding and widespread customs and/or practices include, but are not limited to:

a.    The policy of placing children with foster/adoptive parents without conducting a thorough and complete investigation of the prospective foster/adoptive parents, their home, and the children living within that home.

b.    The policy of placing multiple children with foster/adoptive parents without interviewing and examining the children already placed with such parents.

c.    By acting with deliberate indifference in implementing a policy of inadequate training, and/or by failing to train and supervise its officers, agents and employees, in providing the Constitutional protections guaranteed to individuals, including those under the Fourteenth Amendment, and under California law, when performing actions related to the investigation of child abuse and neglect, including dependency type proceedings.

d.    The policy of acting with deliberate indifference in failing to correct the wrongful conduct of other employees failing to provide the Constitutional protections guaranteed to individuals, including those under the Fourteenth Amendment, when performing actions

related to child abuse and neglect, and dependency-type proceedings.

(The list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile records, which are subject to access, use, and/or disclosure pursuant to California Welf. & Inst. Code §§ 827 and 828.)

88.    Defendant COUNTY, including its FYCS, and Defendant TLC, as the agent of Defendant COUNTY, had a duty to Plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices which confirm and provide for the protections guaranteed them under the United States Constitution, including the Fourteenth Amendment; to use reasonable care to select, supervise, train, control and review the activities of all agents, officers and employees in their employ and to counsel and discipline such employees; and further, to refrain from acting with deliberate indifference to the Constitutional rights of Plaintiffs herein so as to not cause the injuries and damages alleged herein.

89.    Defendants COUNTY and TLC breached their duties and obligations to Plaintiffs, including but not limited to, failing to establish, implement and follow correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review their agents and employees as to their compliance with Constitutional safeguards; by failing to counsel or discipline their agents and employees; and by permitting JOHNSON, SASHITAL, HARPER, MORRISSEY, WINTERS, DE LA CRUZ, KROEZE, GILDAY, ROBERO, TLC, and DOES 1-20, Inclusive, to engage in the unlawful and unconstitutional conduct as herein alleged.

90.    Plaintiffs are informed and believe, and based thereon allege, that Defendants COUNTY and TLC have known for years that their policies, procedures, practices, and customs violate the civil rights of children and their families. Numerous civil rights actions have been brought against Defendant COUNTY regarding its

unconstitutional policies, procedures, practices and customs, yet Defendant COUNTY has continued to follow the unconstitutional policies set forth above.

91.    Defendants COUNTY and TLC knew, or should have known, that by breaching the aforesaid duties and obligations that it was foreseeable that they would, and did, cause Plaintiffs to be injured and damaged by their wrongful policies and acts as alleged herein and that such breaches occurred in contravention of public policy and as to their legal duties and obligations to Plaintiffs.

92.    These actions, or inactions, of Defendants COUNTY and TLC are the legal cause of injuries to Plaintiffs as alleged herein; and as a result thereof, Plaintiffs have sustained general and special damages, as well as incurring attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

93.    Based upon the foregoing, Plaintiffs request the Court to enjoin Defendants COUNTY and TLC from proceeding with their unconstitutional policies and to order them to conform to the mandates of the United States Constitution and laws.

**FOURTH CLAIM FOR RELIEF**

**BREACH OF MANDATORY DUTY**

**(By Plaintiffs Against County and TLC Defendants)**

94.    Plaintiffs adopt and incorporate as if set forth at length, and to the extent applicable, the paragraphs set forth hereinabove.

95.    Defendants had a special duty to protect Plaintiffs while such children were entrusted to their care. Under State Adoption Program Regulations §§ 35177, 35181, and 35183, among other statutes, regulations, and ordinances, Defendants had a duty to investigate prospective adoptive parents, which sections were designed to protect children such as Plaintiffs from physical abuse, sexual abuse, and severe neglect, such as that meted out by Defendants the CENTENOs.

96.    These regulations, among others, required said Defendants to conduct

separate face-to-face interviews with Gina Centeno, Jose Centeno, and all other individual children living in the home, and did not allow any application for adoption to be approved without conducting this investigation. Despite these requirements, Defendants did not interview or meet with Jose Centeno, or interview any of the children residing in the Centeno home, including the CENTENOs' biological children and other foster and adopted children.

97.    In addition, Welfare & Institutions Code §16507.5 requires that when a minor is separated from his or her family, the county welfare department or adoption agency shall make any and all reasonable and necessary provisions for the care, supervision, custody, conduct, maintenance and support of the minor. Despite this requirement, and having received reports of possible abuse of Plaintiffs within the Centeno home, Defendants COUNTY, MCCAY, F. JONES, STATE, LAFFERTY, TLC and DOES 13-30, 33-40, and 42-50 placed Plaintiffs with the CENTENOs for adoption.

98.    Under Welfare & Institutions Code §328, among other statutes, regulations, and ordinances, Defendants had a duty to immediately investigate a potential claim for child abuse or neglect to determine whether child welfare services should be offered to the family. This includes a mandatory duty to investigate interview any child four years of age or older within the family to ascertain the child's view of the home environment.

99.    Despite this mandatory duty, at no time relevant to this action did Defendants interview and/or meet with all children living in the Centeno home.

100.    In addition, Penal Code §11164 requires that, during an investigation of suspected child abuse or neglect, all persons participating in the investigation shall consider the needs of the child victim and "shall do whatever is necessary to prevent psychological harm to the child victim."

101.    As alleged above, Defendants knew, or in the exercise of reasonable care should have known, that the children within the Centeno household were, at a bare

minimum, subjected to emotional abuse. Defendants also knew, or had valid reason to know, that the children were subjected to physical abuse and neglect. Despite this knowledge, Defendants continued to maintain the children in the Centeno home and provided no services to the children or the CENTENOs. In fact, in 2010, with a sustained finding of emotional abuse against Jose Centeno, Defendants COUNTY, JOHNSON, SASHITAL, HARPER, MORRISSEY, WINTERS, and TLC placed Plaintiffs within the Centeno household, causing a substantial risk of harm to Plaintiffs.

102. Under Welfare & Institutions Code §16504, among other statutes, regulations, and ordinances, Defendants had a duty, upon learning of reports to the COUNTY's child welfare services department, to evaluate the risk of abuse, neglect or exploitation of the children who were the subject of that report. This evaluation is required to include collateral contacts and a review of previous referrals.

103. Despite these requirements, Defendants did not consider or gather information from collateral contacts available to them or review previous referrals when they made their evaluations of risk upon learning of reports to the COUNTY of child abuse and neglect within the Centeno household.

104. Under Welfare & Institutions Code §16519, among other statutes, regulations, and ordinances, Defendants had a duty, to ensure the safety, permanency, and well-being of children in their care, and were required to consider the psychosocial history of the home into which children were being placed.

105. Despite these requirements, Defendants did not take into consideration the psychosocial history of the Centeno home when placing Plaintiffs into that home in 2010. These actions endangered Plaintiffs.

106. Additionally, Child Welfare Services Program 31-405.22 requires that social workers monitor the physical and emotional condition of children and take necessary actions to safeguard that growth and development. Despite these requirements, and knowing that Plaintiffs were suffering from emotional and physical

abuse while in the CENTENOs' care, Defendants did nothing to safeguard Plaintiffs' growth and development..

107.     By failing to adhere to the statutory and regulatory requirements, Defendants created the risk and danger contemplated by these regulations, and as a result, unreasonably and wrongfully exposed Plaintiffs to sexual molestation, physical abuse, and severe neglect, among other acts.

108.     Under Welfare & Institutions Code §16501.1, among other statutes, regulations, and ordinances, Defendants had a duty to utilize the CWS-CMS system to access child and family specific information in order to make appropriate and expeditious case decisions. Despite these requirements, there is no evidence said Defendants utilized the CWS-CMS system to access the prior contacts between the COUNTY and the Centeno family, and specifically, the 2010 contacts and sustained finding of emotional abuse against Jose Centeno.

109.     Additionally, Child Welfare Services Program 31-125 requires that a social worker initially investigating a referral shall determine the potential for or the existence of any condition(s) which places the child, or any other child in the family or household, at risk and in need of services. Said Defendants did not do anything to determine the risk to Plaintiffs when they "investigated" the referrals in 2018 and 2019.

110.     By failing to adhere to the statutory and regulatory requirements, Defendants created the risk and danger contemplated by these regulations, and as a result, unreasonably and wrongfully exposed Plaintiffs to sexual molestation, physical abuse, and severe neglect, among other acts.

111.     The physical, mental, and emotional damages and injuries resulting from the physical abuse, sexual abuse, and severe neglect of Plaintiffs by Defendants the CENTENOs were the type of occurrence and injuries that the statutory and regulatory provisions were designed to prevent.

112.     As a result, Defendants' failure to comply with the statutory and

regulatory provisions constituted a per se breach of said Defendants' duties to Plaintiffs.

113.    As a result of the above-described conduct, Plaintiffs suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**FIFTH CLAIM FOR RELIEF**

**NEGLIGENCE**

**(By Plaintiffs Against TLC and DOES 1-20)**

114.    Plaintiffs adopt and incorporate as if set forth at length, and to the extent applicable, the paragraphs set forth hereinabove.

115.    At all times alleged herein, TLC and DOES 42-50 were acting within the course and scope of their agency with the COUNTY.

116.    Defendants TLC and DOES 42-50 had a duty to Plaintiffs to act with reasonable care to ensure that Plaintiffs did not suffer from harm.

117.    Defendants TLC and DOES 42-50 breached their duties of care to Plaintiffs by failing to investigate the home and services provided to Plaintiffs by the CENTENOs, by failing to separately interview Plaintiffs to ensure they were receiving adequate care and services and were not being physically abused, sexually abused, or neglected, and by failing to interview or examine the other children who had been placed in the Centeno home to ensure they were not being physically abused, sexually abused, or neglected.

118.    As a result of the above-described conduct, Plaintiffs suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical

manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**SIXTH CLAIM FOR RELIEF**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(By Plaintiffs Against County and TLC Defendants)**

119.    Plaintiffs adopt and incorporate as if set forth at length, and to the extent applicable, the paragraphs set forth hereinabove.

120.    Defendants' conduct toward Plaintiffs, as described herein, was outrageous and extreme.

121.    A reasonable person would not expect or tolerate the physical abuse, sexual abuse, and severe neglect which Defendants Jose and Gina Centeno inflicted upon Plaintiffs.

122.    Moreover, the conduct of the COUNTY-affiliated Defendants and TLC described hereinabove, which enabled Defendants Jose and Gina Centeno physically abuse, sexually abuse, severely neglect, and torture Plaintiffs over the course of many years was more than any reasonable person would expect or tolerate.

123.    As a result of the above-described conduct, Plaintiffs suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and have incurred and will continue to incur expenses for medical and psychological

treatment, therapy, and counseling.

124.    The wrongful and unlawful conduct of Defendants as herein alleged was intentional, done with malice, and/or performed with conscious disregard for Plaintiffs' rights. As a result of their despicable conduct, Plaintiffs are entitled to recover punitive damages from Defendants for their wrongful acts in in an amount to be shown according to proof at trial.

**SEVENTH CLAIM FOR RELIEF**

**ASSAULT**

**(By Plaintiffs Against County and TLC Defendants)**

125.    Plaintiffs adopt and incorporate as if set forth at length, and to the extent applicable, the paragraphs set forth hereinabove.

126.    Through their physical abuse, severe neglect, and torture of Plaintiffs, Defendants Jose and Gina Centeno put Plaintiffs in imminent apprehension of harmful or offensive contact. Plaintiffs reasonably and actually believed that Defendants Jose and Gina Centeno had the ability to make harmful or offensive contact with Plaintiffs' persons.

127.    Plaintiffs did not consent to the harmful or offensive contact by Defendants Jose and Gina Centeno. Additionally, because they were minors, Plaintiffs lacked the ability to consent to the harmful or offensive contact.

128.    In addition to common law assault, Defendants Jose and Gina Centeno violated Plaintiffs' rights pursuant to Civil Code §§ 43 and 1708.

129.    The COUNTY-affiliated Defendants and TLC authorized and/or ratified the conduct of Defendants Jose and Gina Centeno by leaving Plaintiffs in the care of the Centenos despite the actual and/or implied knowledge of said Defendants that Defendants Jose and Gina Centeno were unfit parents, had neglected, physically abused, and sexually abused other children in their care, and had neglected and abused, and were continuing to neglect and abuse, Plaintiffs. As a result of said

authorization and ratification, said Defendants are vicariously responsible for the actions of Defendants Jose and Gina Centeno.

130.    As a legal result of the Defendants' conduct, Plaintiffs suffered, and will continue to suffer, damages, including but not limited to, mental anxiety and anguish, in an amount not yet ascertained, all of which shall be shown according to proof at trial.

131.    Defendants Jose and Gina Centeno's wrongful and unlawful conduct as herein alleged was intentional, done with malice, and/or performed with conscious disregard for Plaintiffs' rights. As a result of their despicable conduct, Plaintiffs are entitled to recover punitive damages from Defendants Jose and Gina Centeno for their wrongful acts in in an amount to be shown according to proof at trial.

## PRAYER

WHEREFORE, Plaintiffs request trial by jury and pray judgment against the Defendants as follows:

1.    For special, general and compensatory damages in amounts to be proven at the time of trial.

2.    For punitive and exemplary damages in amounts to be proven at the time of trial against all individual defendants named herein, including individual Doe defendants;

3.    For attorneys' fees.

4.    For pre-judgment interest at the prevailing statutory rates.

5.    For costs of suit.

6.    For injunctive relief; and

7.    For such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all causes of action set forth above.

Respectfully submitted,

DATED: April 30, 2024                    MARINHO LAW FIRM


By:   */s/ Sarah E. Marinho*
Sarah E. Marinho, Esq.
Attorney for Plaintiffs